UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-2(c)**

KIRKLAND & ELLIS LLP
James E. Marina
james.marina@kirkland.com
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Attorney for General Motors LLC and General Motors Company

Case No.: 23-12677-ABA

In Re: Joseph J. Ashton
aka Joseph Ashton
aka Joseph J. Ashton, Jr.
Denise M. Ashton
aka Denise Ashton

Judge: Honorable Andrew B. Altenburg, Jr.

Chapter: 13

**GENERAL MOTORS' OBJECTION TO CONFIRMATION OF THE PROPOSED CHAPTER 13 PLAN OF JOSEPH ASHTON AND DENISE ASHTON**

Creditors General Motors Company and General Motors LLC (together, "GM") file this objection to confirmation of the proposed chapter 13 plan (Dkt. No. 12, the "Plan") filed by Joseph and Denise Ashton (together, the "Debtors"). Confirmation should be denied for several reasons. ***First***, the Plan fails to comply with 11 U.S.C. 1325(a)(4), as the Plan does not purport to distribute to GM an amount that would exceed the amount GM would receive under a chapter 7 liquidation. ***Second***, the Plan fails to comply with 11 U.S.C. 1325(b)(2). GM, an unsecured creditor, is objecting to this Plan, and the Plan neither pays GM's claim in full nor provides for all of the Debtors' disposable income during the commitment period to be paid to creditors.

GM initially notes that it serves this Objection without the benefit of discovery. No meeting pursuant to 11 U.S.C. § 341 has occurred to date. GM has also served document requests and a deposition notice on the Debtors pursuant to Rule 2004. (*See* Ex. A, 5/12/23 Rule 2004

Requests to J. Ashton and Ex. B 5/12/23 Rule 2004 Requests to D. Ashton). The Debtors, through counsel, indicated that they were working to provide documents pursuant to the Rule 2004 Request, but no documents have been produced to date. Likewise, the Debtors have not provided times for the requested depositions. At GM's request, the Debtors sought to adjourn the scheduled confirmation hearing, and the accompanying objection deadline, to allow GM time to take the requested discovery. Unbeknownst to GM, Debtors had apparently been delinquent in paying fees to the trustee, and thus the request was denied. (*See* U.S. Trustee docket text entered on 6/6/23). GM accordingly files this preliminary objection in order to preserve its objections to the Plan. To the extent the Court intends to move forward with the potential confirmation of the Plan, GM requests that the Court deny confirmation of the Plan and dismiss the case.

GM will supplement this objection if and when it receives the requested discovery from the Debtors.

## I. FACTUAL BACKGROUND[1]

### A. The Underlying Schemes

Debtor Joseph Ashton previously served as a high-ranking officer in the The International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW"). The UAW is a primary bargaining unit for GM's U.S. employees. From 2010 to 2014, Mr. Ashton served as a Vice President of the UAW in the GM Department; in essence, Mr. Ashton was the UAW's point person in its negotiations and relationship with GM. In his role as Vice President of UAW's GM Department, Ashton had substantial influence over the UAW-GM Center for Human Resources ("CHR"). The CHR was established primarily to educate and train UAW-

[1] Facts concerning these underlying schemes and GM's lawsuit against Mr. Ashton are taken from GM's complaint (the "Complaint"). The Complaint is attached Exhibit C.

represented GM employees, and it was funded by GM. In 2014, Mr. Ashton was appointed to GM's Board of Directors (the "Board"). Mr. Ashton was appointed to that seat by the UAW Trust, which had the right to appoint a member of GM's Board as a result of negotiations coming out of GM's chapter 11 bankruptcy proceeding. Mr. Ashton served on the Board from 2014 until his resignation in December of 2017.

As part of an ongoing investigation into corruption at the UAW and FCA US, LLC ("FCA"), many UAW leaders and FCA executives have been indicted and pled guilty to various crimes arising from two distinct schemes, both of which GM alleges involve Mr. Ashton. ***First***, several UAW leaders, including Mr. Ashton, were indicted and pled guilty arising from a scheme of kickbacks extorted from vendors to the CHR. In short, as admitted, Mr. Ashton and others would steer lucrative CHR contracts to a specific vendor, and then required that vendor to pay tens of thousands of dollars in cash to Mr. Ashton and his conspirators as kickbacks. GM, which provided funding for all CHR projects, was the source of the funds that Mr. Ashton and others directed to their preferred vendor and then received through the kickbacks.

***Second***, many UAW and FCA executives have been indicted and pled guilty in connection with a scheme whereby FCA directed improper payments to UAW executives through the FCA-UAW National Training Center ("NTC").[2] As alleged by GM, FCA made these payments to the UAW in an effort to influence FCA's collective bargaining with the UAW. In addition, FCA used these payments to bribe the UAW to agree to terms through the collective bargaining process that were unfavorable to GM, in an effort to force GM to agree to a merger with FCA. Specific to Mr. Ashton, GM alleges that, while serving on GM's Board, Mr. Ashton disclosed confidential GM

[2] The NTC was meant to be the FCA-UAW equivalent of the GM's CHR.

information to FCA. FCA provided these bribes to Mr. Ashton and others through funding in bank accounts in foreign financial institutions.

**B. GM's Lawsuit Against Mr. Ashton.**

Based on these factual allegations, in September of 2020, GM brought suit against Mr. Ashton in the United States District Court for the District of New Jersey asserting claims for (1) breach of fiduciary duty, (2) fraud, and (3) fraud by omission. In short, GM alleged that Mr. Ashton made numerous material misrepresentations and omissions to GM connection with joining GM's Board. And then, when Mr. Ashton was on the Board, he breached his fiduciary duty to GM by failing to disclose his ongoing kickback scheme related to the CHR and by taking bribes through foreign accounts from FCA in return for providing GM confidential information to FCA.

GM pressed its suit against Mr. Ashton for nearly three years. GM pursued discovery from Mr. Ashton, but ultimately had to expend substantial resources seeking discovery from third parties given that Mr. Ashton disclaimed having many responsive documents in his possession. In early 2023, GM had completed sufficient third-party discovery to be in a position to take Mr. Ashton's deposition. GM sought to notice that deposition on several occasions, but Mr. Ashton would not provide a date for his deposition. When it got to the point that Mr. Ashton was going to be forced to sit for his deposition, he filed this bankruptcy case, staying GM's suit.

GM has asserted that damages from its claims against Mr. Ashton could run into the hundreds of millions or billions of dollars.

**C. The Debtors' Assets and the Proposed Plan.**

On April 24, 2023, the Debtors' filed the Plan, as well as the calculation of their disposable income and a statement of their assets and liabilities. (Dkt. No. 11.) Taking the Debtors' statement of disposable income at face value, the Debtors calculate having $3,713.53 in disposable income available per month. (*Id*. at 7.) In the statement of assets, again taking the Debtors' descriptions

at face value, the Debtors calculate assets of approximately $1.05 million[3] and liabilities of approximately $367,000. (Dkt. No. 1.)[4] The Debtors also identify approximately $704,000 in assets they claim are exempt. (Dkt. No. 11. at 22.)[5] The Debtors disclosures do not list any assets held in foreign financial accounts.

The Plan proposes that the Debtors will make payments of $2,000 per month for approximately 60 months. Using these funds, the Plan proposes to pay priority claims in the amount of $33,000 in full. The Plan proposes to pay unsecured credits an amount of at least $90,000, distributed *pro rata*. In total, the Plan would have the Debtors making payments of $120,000 over the course of five years (Dkt. No. 12).

## II. ARGUMENT

Based on information determined simply from the Debtors' filed statements, and without the benefit of GM's requested discovery, the Plan cannot be confirmed because it fails to comply with several provisions of section 1325.

### A. The Plan Violates the Best Interests Test.

Based on the Debtors' publicly-filed financial documents, the Plan violates the best interests test under 11 U.S.C. § 1325(a)(4). That provision requires that, "the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the

---

[3] GM believes the value certain of the Debtors assets, including their primary residence, are likely understated on the form, but the Debtors have not yet responded to discovery on this topic.

[4] This value does not include any amount for GM's claim against the Debtors.

[5] GM has substantial doubts about certain of the exemptions claimed by the Debtors, including the $232,000 that the Debtors claim as exempt from a SBLI Retirement Annuity. 11 U.S.C. § 522(d)(12) permits Debtors to exempt retirement funds "to the extent that those funds are in a fund or account that is exempt from taxation" under certain provisions. The Debtors have not provided any information to establish that their "Retirement Annuity" fits that requirement.

debtor were liquidated under chapter 7 of this title on such date." In short, the Plan must provide an unsecured creditor such as GM at least as much as would be available under a chapter 7 liquidation.

Here, the Plan does not meet this requirement. The Debtors propose to distribute approximately $90,000 on account of unsecured claims. (*See* Plan.)[6] But based on the Debtors' schedule of assets and liabilities, the Debtors have approximately $1 million of assets, with approximately $700,000 of those assets being claimed as exempt. (Dkt. No. 12 at 22.) Once again, the lack of discovery from the Debtors has made it impossible for GM to test whether those exemptions are appropriate under the statute (particularly with request to the "Retirement Annuity" over which the Debtors claim an exemption). But even putting aside the questionable exemptions, the Debtors have more than $300,000 in assets that could be liquidated and distributed under chapter 7, far in excess of the $120,000 they proposed to distribute under the Plan. Accordingly, the Plan should not be confirmed because the Debtors cannot establish compliance with section 1325(a)(4).

**B. The Plan Violates 11 U.S.C. § 1325(b)(1).**

The Plan also violates the requirements of section 1325(b)(1). Under that provision, where a holder of an allowed unsecured claim (such as GM) objects to a plan, the court

> "may not approve the plan unless, as of the effective date of the plan—
>
> (A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or
>
> (B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first

[6] Even this value is overstated as that amount is to be paid in equal monthly installments over a period of five years. Fully valuing those distributions would require discounting those payments back to present value.

> payment is due under the plan will be applied to make payments to unsecured creditors under the plan."

11 U.S.C. 1325(b)(1).

Once again, the Plan does not comply with this provision. The Plan does not purport to pay GM the entirety of its claims; although GM's claim is unliquidated, the claimed damages are in the hundreds of millions of dollars—far in excess of any distributions to be made under the Plan. Nor does the Plan purport to allow GM's claim to proceed unimpaired. The Plan's treatment of GM's claim thus does not satisfy section 1325(b)(1)(A).

In satisfaction of GM's claim (and the claim of other unsecured creditors), the Plan purports to pay $2,000 per month for a period of five years. The Debtors' own disclosures calculate their disposable income under § 1325(b)(2) at $3,731.53 per month. (Dkt. No. 11 at 7.) Thus, again without the benefit of any discovery to test the calculations generated by the Debtors, the Plan does not satisfy § 1325(b)(2).

## III. CONCLUSION

For these reasons, GM respectfully requests that the Court deny confirmation of the Plan.

Dated: June 7, 2023

Respectfully submitted,

**KIRKLAND & ELLIS LLP**

By: *s/James E. Marina*
James E. Marina (N.J. Bar No. 050791996)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
james.marina@kirkland.com

Jeffrey L. Willian, P.C. (admitted *pro hac vice*)

Hariklia Karis, P.C. (admitted *pro hac vice*)
Stacey G. Pagonis (admitted *pro hac vice*)
Casey McGushin (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
jeffrey.willian@kirkland.com
hariklia.karis@kirkland.com
stacey.pagonis@kirkland.com
casey.mcgushin@kirkland.com

*Attorneys for Creditors General Motors LLC and General Motors Company*